**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
**DONNA M. DiMARE,**                    )
                                        )
        **Plaintiff,**                  )
                                        )
        **v.**                          )        **Civil Action No.**
                                        )        **07-12238-FDS**
**REALTYTRAC, INC.,**                   )
                                        )
        **Defendant.**                  )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S**
**MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE AFFIDAVIT**

**SAYLOR, J.**

This is a civil action arising from the erroneous listing of a property on a website.

Defendant RealtyTrac, Inc., owns and runs a membership-based website that specializes in

gathering and listing publicly-available information on properties that are—or are expected soon

to be—for sale, including foreclosure properties.  Plaintiff Donna M. DiMare owns a residential

property in Burlington, Massachusetts.

In 2006, plaintiff fell behind on her mortgage payments, and her lender initiated

foreclosure proceedings.  Before the foreclosure sale took place, plaintiff filed for bankruptcy,

which stayed the sale.  After the bankruptcy filing, RealtyTrac listed her home on its website as

being subject to a foreclosure sale.  At some point during the summer of 2007, plaintiff began

noticing strangers viewing her property; strangers also made inquiries to her neighbors as to the

property's status, and called her home with offers to purchase the property.  At one point, plaintiff

found a trespasser on her property.   Plaintiff contends that these actions were caused by the

tortious conduct of RealtyTrac, and that she suffered extreme emotional distress as a result.  She

filed suit against defendant on November 27, 2007, alleging negligence and infliction of emotional distress.[1]

Defendant has moved for summary judgment in its favor, and to strike an affidavit of Barbara Santiano, the attorney for plaintiff, filed in opposition to defendant's motion. For the reasons set forth below, the motion to strike will be granted in part, and the motion for summary judgment will be granted.

## I.      Factual Background

The facts are presented in the light most favorable to the non-moving party.

### A.      The DiMare Bankruptcy

Donna DiMare and her husband purchased a home and property at 19 Alcine Lane, Burlington, Massachusetts, in 1989. (DiMare Dep. at 16). She and her husband divorced in 2001, and she received the family home as part of the divorce settlement. (*Id.* at 19-20). She refinanced the property in March 2004 with Ameriquest Mortgage Company and then again in August 2005 with Option One Mortgage Corporation. (*Id.* at 37, 53-54, 59-60).

In 2006, DiMare fell behind in her mortgage payments, and Option One initiated foreclosure proceedings. (DiMare Aff. at ¶ 4). A foreclosure sale was scheduled for January 2, 2007. Option One published two legal notices of mortgagee's sale of real estate in the Burlington Union newspaper—one on December 7 and the other on December 14, 2006.

On December 15, 2006, DiMare filed for bankruptcy protection. (Def. Mem. Ex. 7). The foreclosure sale was stayed as a result. (Def. Mem. Ex. 8).

---

[1] Although the complaint recites three distinct counts, plaintiff only advances two actual claims—negligence and infliction of emotional distress. The third count, which is labeled "injunction," is clearly a prayer for relief, not a theory of recovery.

B.     **RealtyTrac**

RealtyTrac, Inc., operates a website called RealtyTrac.com.  RealtyTrac provides the

following description of its business on its website:

> RealtyTrac . . . is the leading online marketplace of foreclosure properties, with
> more than 1.5 million default, auction and bank-owned listings from over 2,200
> U.S. counties, along with detailed property, loan and home sales data. The
> company's mission is to make it easier for consumers, investors and real estate
> professionals to locate, evaluate, buy and sell properties. RealtyTrac is the only
> major real estate website to feature foreclosure, auction, bank-owned,
> for-sale-by-owner, and resale properties.
>
> RealtyTrac collects and aggregates foreclosure data from more than 2,200
> counties, covering more than 90 percent of U.S. households, appends the data with
> estimated property values, comparable sales, loan history, tax lien and bankruptcy
> records, trustee and lender information and property details and updates the entire
> database twice daily.[2]

According to the RealtyTrac website, in addition to listing homes that are in foreclosure,

RealtyTrac advertises that it has "[a] national network of over 5,000 real estate professionals to

assist users."  (Pl. Opp. Mem. Ex. 9).  It advises users that "[a]lthough RealtyTrac is not an agent

or broker directly selling properties," members[3] can use the site "to find a local real estate agent in

the RealtyTrac Agent Network who can help [them] buy a property."  (Pl. Opp. Mem. Ex. 22).

Elsewhere, it refers to those individuals as "RealtyTrac affiliated agents" or "agents affiliated with

the RealtyTrac network."  (Pl. Opp. Mem. Ex. 25).

Under the heading "How to Buy Foreclosures at RealtyTrac," the website states the

following:

---

[2] Available at RealtyTrac's "About Us" web page,
http://www.realtytrac.com/company/backgrounder.html.

[3] Users of the site can become "members" by paying a fee, which provides them access to additional
information about the property, as well as other services such as the RealtyTrac Agent Network.

STEP 3.  Contact an Agent

If you're a first-time homebuyer and you've never purchased a home, let alone a foreclosure property, it is beneficial to contact a local real estate agent who can guide you through the process of buying a foreclosure.  . . .

You can contact an agent using the RealtyTrac Agent Network.  There is no cost to contact an agent, although you should ask the agent how much he or she charges for commission.  Subscribers can click on the Contact An Agent tab on any member page after you log in or click on any corresponding links on the Search Results or Property Details pages.

(Pl. Opp. Mem. Ex. 23).

Under the same heading, the website states the following:

Contact Owner: Pre-Foreclosure

When a property is in pre-foreclosure (NOD, LIS), the owner still has a chance to stop the foreclosure process by paying off what is owed or by selling the property. The pre-foreclosure period can last several months, so you may need to be patient when trying to contact the owner in default.

The first step is to call the trustee or attorney listed on the Property Details page to confirm if the property is still in foreclosure.  The trustee or attorney has the most up-to-date information if the owner has sold or reinstated the property.  The trustee or attorney cannot answer other questions about the property.

. . .

If the trustee confirms the property is still in foreclosure, and you believe the property could be a wise investment, you should contact the owner in default as soon as possible.  The quickest way to make contact with the owner using RealtyTrac is to click on the "Contact Owner" link on any Property Details page to send a postcard to the owner.  . . .

If the owner does not respond to a postcard you can try to send another postcard (the owner may have a change of heart as the end of the pre-foreclosure period approaches) or you can wait to see if the property is scheduled for auction and attend the auction.

One option is to call the owner if you can track down the phone number.  Another option is to go to the property and try to contact the owner in person, as long as

4

you recognize the ownership rights of the owner.  We don't recommend either of these options if you don't have previous experience.

(*Id.*).

### C.   <u>The Listing of DiMare's Property</u>

On July 3, 2007, RealtyTrac published a listing of DiMare's property on its website. (Compl. Ex. A).  The property listing stated that it was subject to foreclosure sale.  (Def. Mem. Ex. 10).  In addition to the address and general information about the size and layout of the home, the listing indicated that there was a "Sale Pending."  It noted a "Sale Date" of "January 2, 2007, at 4:00 p.m."  (*Id.*).  The date was obviously incorrect, as more than six months had passed since the purported date of sale.

Below the listing was RealtyTrac's standard disclaimer, which states:

> The information at this site is provided solely for informational purposes and does not constitute an offer to sell, rent, or advertise real estate outside the state in which the owner of the site is licensed.  The owner is not making any warranties or representations concerning any of these properties including their availability. Information on this site is deemed reliable, but not guaranteed and should be independently verified. . . .

(*Id.*).

On August 17, 2007, Yahoo! Real Estate published an online listing that described DiMare's property as "a Judgment of Foreclosure Sale" and stated that it was scheduled to be sold at a public sale on "January 2, 2007."  (Pl. Opp. Mem. Ex. 16).  The listing also read "[t]o access more extensive information on this property click the 'more property detail' link below." (*Id.*).  The link referred to indicated "Register with RealtyTrac for more Property Detail."  (*Id.*). The Yahoo! listing also represents that the property was "Offered By" RealtyTrac Inc.  (*Id.*).

5

Other than RealtyTrac.com and Yahoo.com, no other website listed DiMare's property in pre-foreclosure status at that time.[4]

### D.     The Intrusions on the DiMare Property

Sometime during the summer of 2007, DiMare and her children noticed cars driving by her property and parking in front of her house.  (DiMare Dep. at 85).  DiMare's neighbors also observed individuals taking pictures of the property, inquiring about it around the neighborhood, and driving by it.  None of the neighbors, however, ever saw anyone trespassing on the property.  (D. Santiano Dep. at 15; B. Santiano Dep. at 15-16; Dabrowski Dep. at 20).

At some point, DiMare began to suspect that people were trespassing on her property.  She noticed cars pulling into her driveway; when she came out of the house to ask why they were there, they would "take off."  (DiMare Dep. at 87, 92).  Her dog sometimes would bark for no apparent reason.  (*Id.* at 87-89).  She began finding her doors ajar; she told her children not to leave the doors open, but they denied having done so.  (*Id.* at 88).  She also found a gate left open, which she secured with a rope.  (*Id.* at 89).  She never, however, actually saw anyone inside her house.  (DiMare Dep. at 99).

At some point, DiMare stopped a man who she had found walking around her property without permission.  (DiMare Aff. at ¶¶ 8-10;  DiMare Dep. at 90-91, 93-94).  The man told DiMare that he had seen her home listed on RealtyTrac.com and that the website indicated that it would be sold at a foreclosure auction.  (*Id.*).  The man showed DiMare a copy of the listing sheet

---

[4] Defendant disputes this fact.  Specifically, defendant points to a website known as BargainNetwork.com, which appears to have listed DiMare's property at some point in time. (Briefel Aff. at ¶ 3, and Ex. A thereto). DiMare contends that the property listed on BargainNetwork.com is not her property and that the listing on that website was not posted until 2008—well after her injuries occurred.   (Pl. Opp. Mem. at ¶25).

that he had printed from RealtyTrac.com.  (*Id.*).  He also told her that he had spoken to a local

real estate agent whose number he had obtained from the RealtyTrac website.  (*Id.*).  The agent

allegedly told the trespasser that the property was "abandoned and that [he] could just go right

in."  (DiMare Dep. at 90-91).  DiMare asked the man for his name and if she could keep the

listing sheet, but he refused and left immediately.  (DiMare Aff. at ¶¶ 8-10 ; DiMare Dep. at 90-

91).[5]

On September 7, 2007, DiMare filed the present suit against RealtyTrac.

Sometime in January 2008, DiMare went upstairs with her dog.  (DiMare Aff. at ¶ 18).

When she came back downstairs some time later, she noticed that it was cold in the house and

that two doors leading outside were wide open.  (*Id.*; DiMare Dep. at 89).  The refrigerator door

was also ajar.  (DiMare Dep. at 89).  As a result of this incident, DiMare began locking the doors

to her home during the day, which she had never done before.  (*Id.*).

Also around the same time, DiMare was told by the owner of a local convenience store

that he would not accept a check from her, despite her never having written him a check before.

(*Id.* at ¶ 20).  The owner explained that his decision was based upon rumors that she was having

serious financial problems and losing her house.  (*Id.*).[6]

**E.**    **Subsequent Events**

At some point after August 22, 2007, but prior to March 14, 2008, RealtyTrac removed

---

[5] Plaintiff's affidavit also states that her daughter told her that she had been approached by a co-worker, who told her that she found out the house was going to be sold at auction.  There is no evidence, however, as to where the co-worker's mother learned the information.  Furthermore, and in any event, plaintiff's description of her daughter's conversation with a third party is hearsay, and therefore inadmissible.

[6] There is no evidence that the convenience store owner learned that information from the RealtyTrac website.  Plaintiff was, in fact, experiencing serious financial problems—she had stopped paying her mortgage, foreclosure proceedings had been instituted, and she had filed for bankruptcy.

the listing of plaintiff's property from its website.[7]

On March 14, 2008, RealtyTrac re-posted the listing of DiMare's property on its website. (Def. Mem. Ex. 16).  The new listing indicated that the status of DiMare's property was "Pre-foreclosure."  (*Id.*).

On March 27, 2008, a stranger called DiMare and offered to buy her home before the foreclosure auction.  (DiMare Aff. at ¶ 21; DiMare Dep. at 95-96).  The caller told her that she had seen the house on "a list" on the Internet.  (DiMare Dep. at 95-96).  When DiMare asked the caller if she had come inside the house, the caller said "yes."  (*Id.*).  On the same day, DiMare noticed three cars parked in front of her house.  (DiMare Aff. at ¶ 22).

### F.    DiMare's Physical Symptoms

DiMare was diagnosed with fibromyalgia sometime around 1997.  (Compl. at ¶10).  Her symptoms are made worse by stress and lack of sleep.  (*Id.*).  She contends that the actions of RealtyTrac and the resulting intrusions by third parties onto her property and privacy have exacerbated her level of stress, resulting in nausea, vomiting, lack of sleep, loss of appetite, headaches, and anxiety.  (Pl. Opp. Mem. Exs. 5, 26).  DiMare has stated that she is afraid to leave the house unattended and is in "a constant state of worry that someone will come in while [her granddaughters are in the house]."  (DiMare Aff. at ¶¶ 27-28).  She is "nervous at night" and she "jump[s] at every noise and look[s] out the window to make sure no one is there."  (*Id.*).  Although she has been prescribed sleep medication, she is nevertheless unable to sleep because of her pain and stress.  (*Id.*).

---

[7] Plaintiff contends that RealtyTrac removed the listing in October 2007.  (Pl. Opp. Mem. at 7).  However, there is no evidence in the record as to the exact date on which RealtyTrac removed the listing.

II.    **The Motion to Strike the Affidavit of Barbara Santiano**

RealtyTrac has moved to strike an affidavit of Barbara Santiano submitted in opposition to the motion for summary judgment.  Santiano—who represents the plaintiff in this action—submitted an affidavit that conveys the results of a telephone conversation that she had with two persons she identifies as RealtyTrac "member agents."

The Santiano affidavit was submitted by plaintiff in response to an affidavit submitted by Caleb Cobbs, the Chief Financial Officer of RealtyTrac.  The Cobbs affidavit states the following:

RealtyTrac has no offices or employees in Massachusetts.

\*    \*    \*

RealtyTrac does not make any representations to anyone regarding any property on its website other than via its listing on the website.

\*    \*    \*

RealtyTrac has had no communications with any realtor regarding the status of the property located at 19 Alcine Lane, Burlington, MA.

RealtyTrac certainly has not, and never would, advise any person to enter onto a property listed on its website without the permission of the owner.

(Cobbs Aff. ¶¶ 4, 6, 9, 10).

Santiano's affidavit states as follows:

On several occasions (April 1, 2009, April 25, 2009, April 28, 2009, May 14, 2009 and May 15, 2009) I had telephone conversations and exchanged emails with two RealtyTrac member agents in Massachusetts with permission from Defendant's counsel.  The agents were unable to or unwilling to submit a signed document by the deadline date of this filing.  However, both agents provided valuable information regarding the material facts in dispute in this case and will most likely be called as witnesses at trial.  One agent stated one of his complaints about RealtyTrac was that their information is always a few months behind and that he has informed RealtyTrac about this.  The other agent did state that it was her understanding and belief that RealtyTrac customer service representative or agents

do in fact speak with RealtyTrac members; they handle calls and inquiries themselves and do not pass these leads onto the member agents such as herself. The agent was able to inquire about Ms. DiMare's home and the information she received from RealtyTrac does show that there were four inquiries regarding DiMare's property at 19 Alcine Lane, Burlington, MA.  A request for names of these four individuals was requested but has not been received as of the date of this affidavit.

(Santiano Aff. ¶ 3).

The second conversation is the significant one for present purposes, as the Court must assume, for summary judgment purposes, that RealtyTrac's listing of plaintiff's property was inaccurate.  Santiano's testimony as to that second conversation repeats statements made by an unidentified RealtyTrac "member agent" concerning (1) her "understanding and belief" as to the activities of other persons at RealtyTrac and (2) information that she obtained from a review of RealtyTrac records.  At best, that testimony is hearsay, unless plaintiff can establish that the statements fall outside the definition of hearsay or fit within an exception to the rule.  Plaintiff does not point to any specific rule of evidence that would permit the statements to be admitted; it appears that the only potentially applicable rule that would permit their admission is Fed. R. Evid. 801(d)(2)(D), which excludes from the definition of hearsay statements made by an "agent or servant" of a party-opponent "concerning a matter within the scope of the agency or employment."

There is no evidence that the unidentified person was a RealtyTrac employee; Cobbs's affidavit states that RealtyTrac has no employees in Massachusetts, and plaintiff has offered no contrary evidence.  The question, then, is whether the individuals were "agents" of RealtyTrac

10

within the meaning of Rule 801.[8]

As the proponent of the evidence, plaintiff has the burden of demonstrating that the statements fit within the confines of Rule 801 and are thus admissible.  *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990).  The only evidence of any agency relationship between the unidentified real estate professionals and RealtyTrac are the statements on the company's website that it has a "network" of "affiliated" real estate professionals.[9]  There is no other information in the record as to the nature of that affiliation.  It might be reasonable to infer that the real estate professionals are part of a referral network, under which they are paid or share commissions for consummating real estate sales.  It is not, however, reasonable to infer an agency relationship from the mere fact of affiliation.  Affiliation, without more, does not make a person an agent of a party to a lawsuit for purposes of Fed. R. Evid. 801(d)(2)(D).  *See Attorney General v. Irish Northern Aid Committee*, 530 F. Supp. 241, 253 (S.D.N.Y. 1981).  Plaintiff has therefore failed to establish an agency relationship sufficient to satisfy the requirements of Rule 801(d)(2)(D).

Plaintiff attempts to avoid the exclusion of the evidence by contending that she is not offering it for the truth of the matter asserted, but rather for the purpose of challenging the credibility of Cobbs.  (Pl. Opp. Mem. at 1-2.)  But the evidence only challenges Cobbs's credibility, if at all, if it is taken for its truth; the evidence seeks to show that his affidavit is not

---

[8] A principal-agent relationship is created by the manifestation of consent by the principal that the agent has the authority to act on the principal's behalf.  *Commonwealth Alum. Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997).

[9] In this context, the use of the term "agent" to describe persons in the business of representing buyers or sellers in real estate sales is confusing, as the evidentiary issue turns on whether such a person was an "agent" of RealtyTrac.  For the sake of clarity, the Court will use the term "real estate professional."

11

credible by offering statements that contradict his assertions.  It is therefore in fact offered for its truth, and may not be admitted over a hearsay objection.  Furthermore, and in any event, if it is not offered for its truth, the Court may not consider it for its truth.

To the extent, therefore, that the Santiano affidavit contains hearsay statements of unidentified "member agents" of RealtyTrac, it will be struck.  Defendants' motion to strike the affidavit will therefore be granted in part and denied in part.

## IV.   Analysis

### A.   Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

### B.   Negligent Infliction of Emotional Distress

The complaint—which is somewhat disorganized and unclear—alleges claims of "negligence" and "infliction of emotional distress."  It alleges that defendant negligently failed to update its listing of her property to reflect the fact that the foreclosure proceedings had been stayed; that the failure to update the listing caused third parties to engage in various activities

(such as driving by her house, making inquiries, and, trespassing); and that she suffered extreme emotional distress as a result.

Nowhere in the complaint does plaintiff claim that the defendant *intended* to cause her harm, and it is therefore clear that she has not asserted a claim for intentional infliction of emotional distress.[10]  Her claim for "infliction of emotional distress" will therefore be interpreted as one for negligent infliction of emotional distress.

Moreover, although the complaint lists claims of "negligence" and "infliction of emotional distress" separately, the only injury that she has alleged is emotional distress; she does not allege physical injury (other than physical manifestations of emotional distress) or property damage.  The Court will therefore treat the two claims together as a single claim for negligent infliction of emotional distress.  *See Payton v. Abbott Labs*, 386 Mass. 540, 552-557 (1982).

In order to recover for negligent infliction of emotional distress, a plaintiff must prove the following:  "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton*, 386 Mass. at 557 (footnote omitted).  As to the latter element, "the emotional distress for which compensation is sought must be reasonably

---

[10] In the complaint, plaintiff alleges that defendant "intentionally fail[ed] to obtain information concerning bankruptcy filings."  (Compl. ¶ 35).  However, that allegation does not suggest that defendant intended to cause her harm, but rather that it made a conscious decision about whether or not to update its website with information about bankruptcy proceedings.  In order to succeed on a claim for intentional infliction of emotional distress, plaintiff must prove that defendant  intended to inflict emotional distress, or knew or reasonably should have known that emotional distress was the likely result of its conduct.  *See Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997).  Here, although plaintiff arguably alleged that defendant intentionally committed the act that caused her distress, she has not alleged that defendant knew or reasonably should have known that the action would cause her emotional harm.  Furthermore, and in any event, defendant's failure to update its website would not qualify as sufficiently extreme and outrageous conduct as to satisfy the requirements of a claim for intentional infliction of emotional distress.

foreseeable:  unless a plaintiff proves that the defendant knew or should have known of special factors affecting that plaintiff's response to the circumstances of the case, the plaintiff can recover only for that degree of emotional distress which a reasonable person, normally constituted, would have experienced under those circumstances."  *Id.* at 556-57.

Plaintiff's claim may be divided into two parts for purposes of analysis:  her claims based on the trespasses to her property committed by third parties, and her claims based on other events (such as photographing of her house and telephone calls from prospective buyers).  For the reasons set forth below, to the extent her claim is premised on trespasses, it fails for lack of causation evidence.  There is not sufficient evidence in the record from which a reasonable jury could conclude that RealtyTrac was the proximate cause of the tortious acts of third parties.  The remainder of her claim (that is, the part not premised on trespass injury) also fails, as plaintiff has not established that a reasonable person in her circumstances would have suffered severe emotional distress.

### 1.    <u>Trespass Injuries – Causation</u>

Plaintiff must prove that any allegedly negligent acts were the cause of her injuries.  For present purposes, the Court will assume that the photographing of the property, the telephone calls to plaintiff, the frequent driving and parking of cars in front of her property, and the inquiries to neighbors were caused by the incorrect listing.[11]  The claims of third-party trespass, however, are considerably more problematic.

Plaintiff contends that several instances of trespass occurred when she did not actually

---

[11] The Court will also assume that as a result of the inaccurate listing, strangers parked in front of her property in order to view it.  The evidence that people *drove* by her property in response to the listing is tenuous, at best, but the Court will assume for present purposes that causation could be proved as to that aspect of the claim.

observe anyone.  In particular, she testified that she found doors open or ajar, and that her dog

barked for no apparent reason.  She also notes that an unknown caller admitted to having been

inside the house.[12]  Although the evidence as to certain of those trespasses is circumstantial, and

thin at best, the Court will assume for these purposes that those trespasses occurred.[13]

Plaintiff also contends that on one occasion she found a man walking around her property

without permission.  She spoke to him, and ascertained that he had a print-out from defendant's

website.  He told her that he had spoken to a real estate professional whose phone number he

obtained from the RealtyTrac website; that professional had told him that the property was

"abandoned" and he could "just go right in."

Plaintiff's only evidence of the conversation between the trespasser and the real estate

professional is plaintiff's own testimony:  she testified that (1) the trespasser told her that (2) the

real estate professional told him (a) that the property was abandoned and (b) that he could

trespass on it.  That evidence is, on its face, hearsay.[14]  Plaintiff has not attempted to show that

the statement falls within any exception to the general rule, or that it falls outside the definition of

---

[12] The only evidence of the caller's alleged trespass is DiMare's own testimony that the caller admitted that she had been inside DiMare's home.  While that evidence is facially hearsay, it may fall under the exception set forth in Fed. R. Evid. 804 (b) (3) ("A statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability. . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.")  Because the Court will assume that the trespasses actually occurred for purposes of summary judgment, it need not resolve the issue.

[13] The explanation for open doors or gates could be something simple and innocuous, such as the wind blowing them open if they were not properly secured.  Plaintiff had children living at home, who may have left the doors open on their way in or out of the house.  Plaintiff herself admits that she often left the doors to her home unlocked.

[14] The statement of the declarant (the trespasser) is offered to prove the truth of the matter asserted (that the trespasser was told something by the real estate professional).  The statement might be admissible solely on the issue of the trespasser's motive (under Fed. R. Evid. 803 (3)), but not as proof that the real estate professional made such a statement.  In other words, the issue in this case is not what the trespasser *thought*, but what the real estate professional *said*.

hearsay.  Nor is there any apparent reason why the residual exception to the hearsay rules under Fed. R. Evid. 807 should be applied, as there are no circumstantial guarantees of trustworthiness.[15]

Plaintiff did, however, observe a print-out from the RealtyTrac website in the trespasser's hand.  The fact that the trespasser had a print-out from the website on his person at the time he committed the trespass is sufficient to show but-for causation—that is, that the incorrect entry on the website caused him to come to the property to observe it.  The Court will also assume that the evidence of other trespassers is likewise sufficient to show but-for causation as to those intrusions.  It does not follow, however, that defendant is responsible for those trespasses. Instead, the intentional trespasses were intervening acts that broke the chain of causation between defendant's conduct and plaintiff's injuries.

An intervening act of a third party is a superseding cause if the defendant could not have reasonably foreseen the occurrence of such an act.  *Commonwealth v. Carlson*, 447 Mass. 79, 84 (2006).  The test of whether an independent intervening act interrupts the original chain of causation is whether that act is a reasonably foreseeable result of the negligent act.  *Id.* at 84 (citing cases).  In order for an activity to be foreseeable, it must be among the risks making defendant's conduct negligent.  RESTATEMENT (THIRD) of TORTS: Liab. Physical Harm § 19 (2005).

There are, certainly, reasonably foreseeable consequences of the inaccurate listing of a property for sale.  Among those consequences are prospective purchasers walking or driving by

---

[15] Furthermore, and as a matter of fairness, neither the identity of the trespasser nor the real estate professional is known, so RealtyTrac can neither cross-examine the declarant nor perform a factual investigation to try to rebut it.

the house, taking exterior photographs, and making telephone inquiries about the property.  It is

not, however, reasonably foreseeable that a prospective purchaser of real estate—after viewing a

website indicating that a property was for sale or in foreclosure—would deliberately trespass on

the property.

There are circumstances under which a negligent party may be held responsible for harm

caused by third-party tortfeasors or criminal actors.[16]  This, however, is not such a case.  Plaintiff

has pointed to no case, and the Court has found none, where liability was imposed under

circumstances similar to those presented here.[17]

Of course, if defendant directed, encouraged, or sanctioned the third party's trespass,

causation could be established.[18]  But, as noted, plaintiff has not submitted admissible evidence to

show that the real estate professional with whom the trespasser spoke was an employee or agent

of the defendant.  Nor was it reasonably foreseeable to defendant that an incorrect listing on their

website would cause an affiliated real estate professional to advise a potential purchaser to

commit a trespass.  There is thus no admissible evidence that an agent of RealtyTrac sanctioned

the trespass.

---

[16] For example, "many cases have established that liability may arise solely from the violation of an affirmative duty to act with reasonable care to prevent harm to another caused by a third person." *Irwin v. Ware*, 392 Mass. 745, 760 (1984) (citing cases).  That affirmative duty normally arises out of a special relationship between the parties, such as the relationship between a common carrier and a passenger. *See, e.g.*, *Sharpe v. Peter Pan Bus Lines, Inc.*, 401 Mass. 788 (1988).

[17] If an *inaccurate* website listing of a property for sale is an invitation to trespass, so too is an *accurate* listing.  If that is true, real estate professionals might be deemed to have an affirmative duty to sellers to take steps to protect against trespassers, or to warn sellers of the possible dangers of trespass.  The ramifications of such an outcome might be far reaching indeed.

[18] To the extent the RealtyTrac website said anything at all on the subject, it was to the opposite effect.  It suggests that under some circumstances, a prospective purchaser might "go to the property and try to contact the owner in person," but adds, "as long as you recognize the ownership rights of the owner."  (Pl. Opp. Mem. Ex. 23).

17

Plaintiff accordingly cannot establish that defendant was the proximate cause of any trespass on her property, and any claim based on those alleged trespasses must necessarily fail.

### 2.    Other Injuries – The "Reasonable Person" Standard

As described above, plaintiff must prove that a reasonable person in her position would have suffered the level of emotional distress that she suffered.  In this context, the Court will assume that defendant could have reasonably foreseen that an erroneous website listing might cause third parties to try to view the property, and to take other actions consistent with an intent to consider purchasing the property.  Among other things, defendant could have reasonably foreseen that third parties would drive or walk by the house, park on the street in front of the house, take photographs of the house, make inquiries to neighbors, or telephone the property owner to make inquiries or to attempt to purchase the property.

Those activities are, however, fairly innocuous, and amount at most to minor nuisances.[19] It is not reasonably foreseeable that a homeowner in plaintiff's position would suffer extreme symptoms, such as severe sleep deprivation, nausea, vomiting, lack of sleep, loss of appetite, and headaches.  At most, a reasonable homeowner would have become irritated or annoyed in response to such behavior.

This is not an instance where the defendant must take the plaintiff as it finds her—the proverbial "eggshell skull" plaintiff who suffers an extreme injury in response to a relatively minor act of negligence.  *See generally Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990).  To recover for negligent infliction of emotional distress, plaintiff must show that a reasonable person

---

[19] Plaintiff has not asserted a claim for nuisance, and the Court makes no judgment as to whether such a claim might be viable.

would have suffered the same level of emotional distress under similar circumstances. *Payton*,

386 Mass. at 556-57.  Defendant cannot have reasonably foreseen that such an extreme reaction

would have occurred in response to an incorrect listing of the property.

Accordingly, plaintiff cannot establish the elements of a claim for negligent infliction of

emotional distress.

### C.    First Amendment Defenses

Because there is an insufficient evidentiary basis for plaintiff's claims to survive summary

judgment, there is no need to address the First Amendment defenses asserted by defendant.[20]

### V.    Conclusion

For the foregoing reasons, Defendant's Motion to Strike the Affidavit of Barbara Santiano

is GRANTED in part, as described above, and DENIED in part.  Defendant's Motion for

Summary Judgment is GRANTED.

**So Ordered.**

   /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 25, 2010

---

[20] Similarly, it is not necessary for the Court to reach defendant's pending motions to preclude plaintiff's expert's testimony and to compel answers to interrogatories.